1
2
3
4 **UNITED STATES DISTRICT COURT**
5 **DISTRICT OF NEVADA**
6 * * *

7 MIGUEL ANGEL MALDONADO
VAZQUEZ, on behalf of himself as an
8 individual and on behalf of others similarly
situated,
9
10                  Plaintiffs,
11        v.
12 THOMAS E. FEELEY, *et al.*,
13                  Defendants.
14

Case No. 2:25-cv-01542-RFB-EJY

**ORDER**

15
16        Before the Court is the (ECF No. 5) Motion for Preliminary Injunction by Petitioner-
17 Plaintiff Miguel Angel Maldonado Vazquez. For the following reasons, the Court grants the
18 Motion for Preliminary Injunction.
19
20 **I.    INTRODUCTION**
21        This case is one of a growing number of challenges in this District and across the country
22 to the Government's new policy of mandatory detention of all noncitizens charged with entering
23 the United States without inspection during the pendency of their removal proceedings. The
24 challenged policy subjects millions of noncitizens to mandatory prolonged detention without the
25 opportunity for release on bond, no matter how long they have resided within the country.[1] The

26
27        [1]*See* Josh Gerstein & Kyle Cheney, Immigration Appeals Court Expands Mandatory
Detention for Millions, Politico (Sept 5, 2025 at 8:44 p.m. ET),
https://www.politico.com/news/2025/09/05/immigration-mandatory-detention-00548660,
28 [https://perma.cc/5XYT-ZKJV].

policy arises from the recent decision by the Department of Homeland Security (DHS) and the Department of Justice (DOJ) to significantly alter its interpretation of the Government's detention authority during the pendency of removal proceedings under the Immigration and Nationality Act (INA).

Named Plaintiff-Petitioner (hereinafter "Petitioner") Miguel Angel Maldonado Vazquez commenced this action by filing a hybrid Class Action Complaint and 28 U.S.C. § 2241 Petition for Writ of Habeas Corpus challenging DHS' new mandatory detention policy as unlawful under the INA, the Administrative Procedure Act ("APA") 5 U.S.C. §702, 706, and the due process clause of the Fifth Amendment of the U.S. Constitution. He further alleges he was intercepted and arrested by ICE agents pursuant to a policy of racially motivated vehicle stops in violation of his Fourth Amendment rights. He seeks to represent himself individually and others similarly situated within the District of Nevada and requests declaratory and injunctive relief to prevent Defendants-Respondents (hereinafter "Respondents") from continuing to detain him and putative class members pursuant to the Government's new detention policy.

The instant Motion for Preliminary Injunction by Petitioner sought his release from ICE custody, pending class certification and resolution of this action on the merits. Petitioner was detained pursuant to DHS' invocation of an automatic stay under C.F.R. § 1003.19(i)(2), which held a Las Vegas Immigration Judge's order that Petitioner be released on bond in abeyance, pending DHS' appeal to Bureau of Immigration Appeals (BIA). The sole basis for the appeal is DHS and DOJ's sweeping new reading of the INA as subjecting Petitioner and millions of other undocumented individuals to mandatory detention. In a habeas petition raising a challenge to the automatic stay in the same context, this Court found C.F.R. § 1003.19(i)(2) unconstitutional both facially and as applied and ordered the three petitioners released from ICE custody. See Herrera Torralba v. Feeley, et al., Case No. 2:25-cv-01366-RFB-DJA, ECF No. 32 at *11-12 (D. Nev. Sept. 5, 2025). On September 9, 2025, the Court thus granted Petitioner Maldonado Vazquez's Motion for Preliminary Injunction from the bench and ordered his release based on the unconstitutionality of the automatic stay, consistent with its previous ruling in Herrera Torralba, with a written order to follow. See ECF No. 24.

Immediately following this Court's ruling in <u>Herrera Torralba</u>, on September 5, 2025, the BIA issued a decision adopting DHS' interpretation of the INA as mandating detention without bond for millions of noncitizens who reside in the U.S. <u>See</u> <u>Matter of Hurtado</u>, 29 I&N Dec. 216 (BIA 2025). Because of this intervening change in the position of the BIA, the Court here also addresses the statutory question it previously declined to decide. <u>See</u> <u>Herrera Torralba</u>, Case No. 2:25-cv-01366-RFB-DJA, ECF No. 32 at *11-12 (declining to decide the merits of DHS' statutory argument or its likelihood of success before the BIA).

## II.    PROCEDURAL HISTORY

On August 20, 2025, Petitioner filed his Class Action Complaint and Petition for Writ of Habeas Corpus against Respondents Thomas E. Feeley, Field Office Director of the Salt Lake City Field Office of U.S. Immigration and Custom Enforcement (ICE)'s Enforcement and Removal Operations Division, John Mattos, Warden of the Nevada Southern Detention Center in Pahrump, Nevada, Respondent and Defendant Krisi Noem, Secretary of DHS, Defendant DHS, Respondent and Defendant Pamela Bondi, Attorney General, Defendant Executive Office for Immigration Review (EOIR), Defendant Sirce Owen, Director of EOIR, and the Las Vegas Immigration Court. ECF No. 1. On August 22, 2025, the Court conducted a preliminary review of the Complaint/Petition and set a deadline for Defendants to appear in this action and file a response. ECF No. 4.

On August 26, 2025, Petitioner filed the instant Motion for Preliminary Injunction and Declaration in support. ECF Nos. 5-6. On August 27, 2025, counsel for Respondents appeared in this action. ECF No. 8. On August 28, 2025, the Court found the Motion warranted expedited consideration and set a shortened briefing schedule and hearing. ECF No. 9. On September 3, 2025, Respondents filed their Opposition to the Motion for Preliminary Injunction. ECF No. 15. On September 5, 2025, Petitioner filed supplemental authority and a supplemental declaration in support of his Motion, as well as his Reply. ECF No. 17-20. On September 8th and 9th, 2025, Petitioner filed additional supplemental materials in support of his Motion for Preliminary Injunction. ECF Nos. 22-23. On September 9, 2025, the Court held a hearing on the Motion, and

granted it from the bench based on its finding that Petitioner was unconstitutionally detained pursuant to the automatic stay pending appeal under C.F.R. § 1003.19(i)(2). ECF No. 24. The Court specified that a full written order setting forth its ruling in detail, as well as the remaining statutory and constitutional issues raised in the Motion for Preliminary Injunction, was forthcoming. Id.

The Court's full written Order on the Motion for Preliminary Injunction follows.

### III.   BACKGROUND

The Court makes the following findings of fact based on the record in this case.

#### A. Plaintiff-Petitioner Maldonado Vazquez

Petitioner is a noncitizen who has lived in the United States for approximately 20 years. He has no criminal history in the U.S. or elsewhere. He owns and operates a small landscaping and construction business, serving both residential and commercial clients, and files federal income taxes each year. Petitioner and his wife are longtime Nevada residents and parents of three U.S.-citizen children, Miguel Jr. (18), Melissa (13), and Yahir (6), all of whom reside with Petitioner in Las Vegas, where Petitioner has deep community ties.

On the morning of July 7, 2025, in Las Vegas, while driving his work truck to a job site, Petitioner was stopped by officers from ICE and U.S. Border Patrol, far from any international border or port of entry. He was not shown a warrant and alleges the stop itself was racially motivated and violative of his Fourth Amendment rights.

The officers questioned Petitioner about his immigration status, and he informed them he is a citizen of Guatemala without current immigration documents. The officers arrested him and transported him to ICE custody, where he was detained at the Nevada Southern Detention Center (NSDC) in Pahrump, Nevada. According to a July 7, 2025 DHS Notice to Appear, Petitioner is charged with being inadmissible under Section 212(a)(6)(A)(i) of the INA as "an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General" and is subject to newly commenced removal proceedings under 8 U.S.C § 1183(a)(6)(A)(i).

After detaining him, ICE did not set bond, and Petitioner sought review of his custody by the Las Vegas Immigration Court. At the July 31, 2025 custody redetermination hearing, Immigration Judge (IJ) Glen Baker considered DHS' argument that Petitioner was subject to mandatory detention under 8 U.S.C. § 1225(b). Finding that Petitioner has not been designated as an "arriving alien," was not placed in expedited removal proceedings, does not appear to be a recent entrant to the U.S. within the last two years, and was not apprehended near the U.S./Mexico border, IJ Baker rejected DHS' argument and found that § 1226(a), not § 1225(b)(2), governed Petitioner's detention and therefore gave the court jurisdiction to consider Petitioner's eligibility for bond. See ECF No. 15-4. After reviewing the evidence, IJ Baker found, by clear and convincing evidence, that Petitioner was neither a danger to the community nor a flight risk and ordered his release on bond at the lowest possible amount of $1,500, with alternatives to detention at DHS' discretion.

Within 24 hours of IJ Baker's order that Petitioner be released on bond, DHS filed an Executive Office of Immigration Review (EOIR) form (EOIR-43) to automatically stay the order pending DHS' appeal to the BIA, pursuant to 8 C.F.R. § 1003.19(i)(2). On August 12, 2025, within the 10-day period required by the regulation, OPLA filed a notice of appeal to the BIA, which explained the appeal was based solely on the legal argument that § 1225 not § 1226 applied to Petitioner. It is pursuant to this automatic stay that Petitioner remained detained in ICE custody despite having been ordered released on bond.

As a result of his prolonged detention, Petitioner's wife was left solely responsible for caring for his three children and paying all household expenses. His youngest son lost his appetite due to his sadness about his father's absence, while his eldest 18-year-old son was tasked with running the family's landscaping business, and the loss of income caused by Petitioner's detention made it impossible for his family to pay for an immigration attorney. Petitioner's attorney is currently representing him *pro bono*. Petitioner's detention limited his ability to communicate with his attorney, gather documents, or contact witnesses and obtain other supporting evidence needed for his ongoing removal proceedings. He further suffered mentally and emotionally due to being detained and separated from his family, knowing how

1    they struggled in his absence.

2        **B.  Legal Framework**

3        The following statutory and regulatory background is relevant to the challenged

4    mandatory detention policy under the INA and its application to Petitioner.

5            ***i.  Detention Authority under the INA***

6        The INA generally provides for three forms of civil detention for noncitizens in removal

7    proceedings. First, 8 U.S.C. § 1226 authorizes the detention of noncitizens arrested "on a

8    warrant" pending the resolution of standard removal proceedings before an IJ. See 8 U.S.C. §

9    1229(a). Unless they have been arrested, charged with, or convicted of certain enumerated

10   crimes, which would subject them to mandatory detention until their removal proceedings are

11   concluded, see 8 U.S.C. § 1226(c), an individual detained under § 1226(a) can be released by

12   ICE on bond or conditional parole. See 8 U.S.C. § 1226(a)(1); 8 C.F.R. § 236.1(c)(8). If release

13   is denied by ICE, the detainee can seek a custody redetermination before an IJ (*i.e.*, bond

14   hearing) at the outset of their detention, see 8 C.F.R. §§ 1003.19(a), 1236.1(d). At the hearing,

15   the noncitizen may present evidence to show they are not a flight risk or danger to the

16   community and should therefore be released on bond. See generally Matter of Guerra, 24 I. & N.

17   Dec. 37, 50 (BIA 2006).

18       Second, the INA imposes mandatory detention of noncitizens subject to expedited

19   removal under 8 U.S.C. § 1225(b)(1) and of an "applicant for admission, if the examining

20   immigration officer determines that an alien seeking admission is not clearly and beyond a doubt

21   entitled to be admitted" under § 1225(b)(2). Individuals detained under § 1225(b) receive no

22   bond hearing, see 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV), (b)(2)(A), and can only be released

23   under humanitarian parole at the arresting agency's (*i.e.*, ICE) discretion. See Jennings v.

24   Rodriguez, 583 U.S. 281, 288 (2018); 8 U.S.C. § 1192(d)(5).

25       Lastly, the INA provides for detention of noncitizens who have been issued a final order

26   of removal. See 8 U.S.C. § 1231(a)-(b).

27       This case concerns the mandatory versus discretionary detention provisions under §

28   1226(a) and § 1225(b)(2), which were enacted as part of the Illegal Immigration Reform and

Immigrant Responsibility Act (IIRIRA) of 1996, Pub. L. No. 104-208, Div. C, §§ 302–03, 110 Stat. 3009-546, 3009–582 to 3009–583, 3009–585. Section 1226 was most recently amended this year by the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). Respondents' challenged policy is based on a reading of § 1225(b)(2) to require mandatory detention for any individual who entered the U.S. without inspection despite having not been apprehended upon arrival or shortly thereafter.

Prior to the enactment of the IIRIRA, noncitizens arrested in the interior and charged with entering the U.S. without inspection were entitled to a custody hearing before an IJ or other hearing officer, while those stopped at the border were only entitled to release on parole. See 8 U.S.C. § 1252(a) (1994) (authorizing detention of noncitizens "arriving at ports of the United States"). Congress clarified that the IIRIRA amendment of § 1226(a) simply "restate[d]" the detention authority previously found at § 1252(a) "to arrest, detain, and release on bond a[] [noncitizen] who is not lawfully in the United States.". See H.R. Rep. No. 104-469, pt. 1, at 229 (1996); see also H.R. Rep. No. 104-828, at 210 (1996) (Conf. Rep.). Congress separately maintained the existing mandatory detention scheme for noncitizens arriving in the U.S. without a clear right to admission and expanded the scope of that detention scheme to include certain recently arrived noncitizens. Compare 8 U.S.C. § 1225(b) (1994 ed.), with 8 U.S.C § 1225(b)(1)-(2). These amendments were designed to address the perceived problem of noncitizens *arriving* in the U.S. See H.R. Rep. No. 104-469, p. 1, at 157-58, 228-29.

In distinguishing between noncitizens arriving versus noncitizens residing in the U.S., Congress reflected its understanding of longstanding due process precedent that recognizes the more substantial due process rights of noncitizens already residing in the U.S. with those of noncitizens recently arriving. Id. at pt. 1, at 163-66 (recognizing the "constitutional liberty interest[s]" of noncitizens present in the U.S., versus the assumed minimal due process rights of arriving noncitizens) (citing Knauff v. Shaughnessy, 338 U.S 537 (1950)).

Until DHS and DOJ adopted the policy described below, the longstanding practice of the agencies charged with interpreting and enforcing the INA applied § 1226(a) to noncitizens like Petitioner, who entered the U.S. without inspection and were apprehended while residing in the

U.S. The EOIR's regulations drafted following the enactment of the IIRIRA explained this distinction. See Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination . . . The effect of this change is that inadmissible aliens, except for arriving aliens, have available to them bond redetermination hearings before an immigration judge, while arriving aliens do not. This procedure maintains the *status quo* . . ."). Accordingly in the decades since IIRIRA was enacted, DHS and the EOIR have applied § 1226(a) to the detention of individuals apprehended within the continental U.S. who entered without inspection and provided them access to release on bond. That is consistent with the attestation of Petitioner's counsel, that prior to the change in policy on July 8, 2025 described below, noncitizens apprehended in the U.S. whom he represented in Las Vegas Immigration Court were granted individualized bond hearings under § 1226(a), and DHS never argued that that section did not apply to them. See ECF No. 19.

The Laken Riley Act created additional exceptions to § 1226 and authorized mandatory detention for certain categories of noncitizens under § 1226(c). See Pub. L. No. 119-1, 139 Stat. 3 (2025); 8 U.S.C. § 1226(c). Specifically, § 1226(c)(1)(E) (enacted by the Laken Riley Act) requires mandatory detention for people who were charged as being (1) inadmissible under § 1182(a)(6)(A)(i) (the inadmissibility ground for entry without inspection) or (a)(7) (the inadmissibility ground for lacking valid documentation to enter the U.S.) *and* who (2) have been arrested, charged with, or convicted of certain crimes not relevant here. 8 U.S.C. § 1226(c)(1)(E). The Laken Riley amendments otherwise continued to authorize discretionary detention of noncitizens charged with being inadmissible who do not fall into those enumerated exceptions.

### ii.  *DHS' New Mandatory Detention Policy Effective July 8, 2025*

On July 8, 2025, DHS instituted a notice titled "Interim Guidance Regarding Detention

Authority for Applicants for Admission" to all ICE Employees.[2] The Notice indicated that DHS, in coordination with the DOJ, "revisited its legal position" on the INA and determined that § 1225(b)(2), rather than § 1226, is the applicable immigration authority for any alien present in the U.S. "who has not been admitted. . . whether or not at a designated port of arrival."[3] Accordingly, "it is the position of DHS that such aliens are subject to [mandatory] detention under INA § 235(b) and may not be released from ICE custody except by INA § 212(d)(5) parole."[4] The Notice further provides "[t]hese aliens are also ineligible for a custody redetermination hearing (bond hearing) before an immigration judge and may not be released for the duration of their removal proceedings absent a parole by DHS. For custody purposes, these aliens are now treated in the same manner that 'arriving aliens' have historically been treated."[5]

### iii.  *The Automatic Stay Under 8 C.F.R. §1003.19(i)(2)*

Prior to 2001, detainees subject to discretionary detention under 8 U.S.C. § 1226(a) who were granted bond by an IJ remained detained only if the BIA granted a request to stay the bond order. 8 C.F.R. § 1003.19(i)(2) (1998) (permitting the use of automatic stays only where the noncitizen was subject to a mandatory detention statute). In 2001, the Immigration and Naturalization Service (now DHS) implemented an interim rule to expand its authority to issue automatic stays of IJs' custody decisions pending their appeal. See Executive Office for Immigration Review (EOIR), Review of Custody Determination, 66 Fed. Reg. 54909, 54910 (Oct. 31, 2001). The INS emphasized that the stay was "a limited measure," to be used only "where the Service determines that it is necessary to invoke the special stay procedure pending appeal." Id.

---

[2] The memo was leaked to the American Immigration Lawyers Association ("AILA"). See ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission, AILA Doc. No. 25071607 (July 8, 2025), https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission [https://perma.cc/5GKM-JYGX]. Defendants do not contest the authenticity of this screenshot.

[3] Id.

[4] Id.

[5] Id.

In the early 2000s, several federal courts concluded the automatic stay provision violated the due process rights of detainees. See Zavala v. Ridge, 310 F. Supp. 2d 1071 (N.D. Cal. 2004) (finding that continued detention pursuant to the automatic stay despite the IJ's decision to grant bond violated procedural and substantive due process rights); Bezmen v. Ashcroft, 245 F. Supp. 2d 446 (D. Conn. 2003) (finding the government goal of preventing the release of noncitizens posing a threat to national security was not served by the petitioner's ongoing detention and was outweighed by the petitioner's Fifth Amendment right to be free from detention); Zabadi v. Chertoff, No. 05-CV-1796 (WHA), 2005 WL1514122 (N.D. Cal. June 17, 2005) (finding the automatic stay provision unconstitutional); Uritsky v. Ridge, 286 F. Supp. 2d 842 (E.D. Mich. 2003) (same).

In 2006, the EOIR promulgated the final and current rule, which added the requirement that to preserve the automatic stay, the attorney for DHS must file with the notice of appeal a certification by a senior legal official that (i) the official approved the filing of the notice of appeal according to review procedures established by DHS; *and* (ii) "the official is satisfied that the contentions justifying the continued detention of the alien have evidentiary support, *and* the legal arguments are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing precedent or the establishment of new precedent." 8 C.F.R. § 1003.6(c) (emphasis added). This certification requirement was added "to allay possible concerns that in some case the automatic stay might be invoked . . . without an adequate factual or legal basis." See EOIR, Review of Custody Determination, 71 Fed. Reg. 57873, 57876 (Oct. 2, 2006). The regulation also sets forth a procedure by which DHS may request an emergency stay of an IJ's custody determination from the BIA, which initiates expedited preliminary review by the BIA to determine whether a stay is warranted based on the individual circumstances of the detainee and the merits of DHS' appeal. See 8 C.F.R. § 1003.19(i)(1).

### iv. *The Challenged Policy and Practice in Nevada*

Since the July 8, 2025 DHS Guidance Memo, Petitioner asserts most IJs in Las Vegas have rejected DHS' new interpretation of § 1225(b)(2), and instead found jurisdiction under § 1226(a) over noncitizens like Mr. Maldonado Vazquez who were arrested within the U.S. and

have resided here for a long period of time. This is supported by the record in the habeas petition resolved by this Court, brought by three noncitizen petitioners, all longtime U.S. residents apprehended by ICE far from any international border or port of entry, who, after being taken into ICE custody without bond, were granted release on bond pursuant to the custody redeterminations of Las Vegas IJs. Herrera Torralba, Case No. 2:25-cv-01366-RFB-DJA, ECF No. 32 at *6-10 (D. Nev. Sept. 5, 2025). In that case, three separate Las Vegas IJs considered and rejected DHS' statutory interpretation and found jurisdiction over each petitioner under § 1226(a). Id.

In response, as here, DHS filed a Form EOIR-43 to stay the IJs' bond release orders pending appeal to the BIA, based solely on DHS' post July 8th reading of §1225(b)(2), with no separate showing of individualized facts justifying continued detention such as danger or flight risk, nor showing of likelihood of success on the merits of the appeal. Id. The Government in Herrera Torralba—after representing to the Court that a certification was made by a senior legal official that the appeals were factually and legally warranted as to each petitioner, consistent with the requirements of 8 C.F.R. § 1003.6(c)—failed to supplement the record with evidence of such certifications, despite being ordered to do so. Id. Similarly, in this case, Respondents have not presented any evidence that a certification exists as to Petitioner as required by the automatic stay regulation.

## IV.    LEGAL STANDARDS

### A.  Preliminary Injunction

Pursuant to Federal Rule of Civil Procedure 65, a court may grant preliminary injunctive relief to prevent "immediate and irreparable injury." Fed R. Civ. P. 65(b). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that the

1  public interest favors an injunction." Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc., 758

2  F.3d 1069, 1071 (9th Cir. 2014), as amended (Mar. 11, 2014) (citing Winter, 555 U.S. at 20).

3      In the Ninth Circuit, a preliminary injunction may also issue under the "serious

4  questions" test. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134 (9th Cir. 2011)

5  (affirming the continued viability of this doctrine post-Winter). According to this test, "serious

6  questions going to the merits and a balance of hardships that tips sharply towards the plaintiff

7  can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a

8  likelihood of irreparable injury, and that the injunction is in the public interest." Id. at 1135.

9  Courts in the Ninth Circuit evaluate "these factors on a sliding scale, such that a stronger

10  showing of one element may offset a weaker showing of another." Recycle for Change v. City of

11  Oakland, 856 F.3d 666, 669 (9th Cir. 2017).

12      **B. § 2441 Petition for Writ of Habeas Corpus**

13      The Constitution guarantees that the writ of habeas corpus is "available to every

14  individual detained within the United States." Hamdi v. Rumsfeld, 542 U.S. 507, 525 (2004)

15  (citing U.S. Const., Art I, § 9, cl. 2). "The essence of habeas corpus is an attack by a person in

16  custody upon the legality of that custody, and . . . the traditional function of the writ is to secure

17  release from illegal custody." Preiser v. Rodriguez, 411 U.S. 475, 484 (1973). A writ of habeas

18  corpus may be granted to a petitioner who demonstrates that he is in custody in violation of the

19  Constitution or federal law. 28 U.S.C. § 2241(c)(3). Historically, "the writ of habeas corpus has

20  served as a means of reviewing the legality of Executive detention, and it is in that context that

21  its protections have been strongest." I.N.S. v. St. Cyr, 533 U.S. 289, 301 (2001). Accordingly, a

22  district court's habeas jurisdiction includes challenges to immigration-related detention.

23  Zadvydas v. Davis, 533 U.S. 678, 687 (2001); see also Demore v. Kim, 538 U.S. 510, 517

24  (2003).

25

26  **V.    DISCUSSION**

27      **A. Jurisdiction**

28      As an initial matter, Respondents state, without citation or further discussion, that "this

- 12 -

Court . . . has no jurisdiction over [Petitioner's] immigration case" and suggest that only the Ninth Circuit can review Petitioner's claims, after DHS' appeal before the BIA is resolved. ECF No. 15 at 9. As such the Court briefly addresses its jurisdiction over Petitioner's challenge to Respondents' detention policy.

Respondents appear to suggest that because Petitioner challenges his detention pending removal proceedings, this Court is stripped of jurisdiction to review his challenge under the jurisdiction stripping provisions of the INA. There are several sections of the INA that present potential bars to this Court's jurisdiction, including 8 U.S.C §§ 1252(b)(9), 1252(g), and 1252(a). While Respondents have not explicitly asserted these sections apply here, the Court will address them. See Arbaugh v. Y&H Corp., 546 U.S. 500, 501 (2006) (outlining all courts' "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party"). Additionally, at the hearing on the instant Motion, Respondents argued this Court lacks jurisdiction to review Petitioner's challenge under § 1226(e). The Court briefly addresses that argument below as well. In evaluating the jurisdiction stripping provisions of the INA, the Court is guided "by the general rule to resolve any ambiguities in a jurisdiction-stripping statue in favor of the narrower interpretation and by the strong presumption in favor of judicial review." Arce v. United States, 899 F. F.3d 796, 801 (9th Cir. 2018) (per curiam) (internal quotations and citations omitted).

### i. *Section 1252(b)(9)*

8 U.S.C. § 1252(b)(9) channels "[j]udicial review of all questions of law . . . including interpretation of constitutional and statutory provisions, arising from any action taken . . . to remove an alien from the United States" to the appropriate federal court of appeals—here the Ninth Circuit. However, the Supreme Court has indicated that were a Petitioner is not "asking for review of an order of removal;" "challenging the decision to detain them in the first place or seek removal;" or "challenging any part of the process by which their removability will be determined," § 1252(b)(9) is not a jurisdictional bar. Nielsen v. Preap, 586 U.S. 392, 402 (2019). The Court finds Petitioner's challenge to his continued detention as unlawful under the INA and U.S. Constitution does not fall into any of those categories. See Dep't of Homeland Sec. v.

1    Regents of the Univ. of California, 591 U.S. 1, 19 (2020) ("§ 1252(b)(9) does not present a

2    jurisdictional bar where those bringing suit are not asking for review of an order of removal, the

3    decision to seek removal, or the process by which removability will be determined."). Gonzalez

4    v. U.S. Immig. and Cust. Enf't, 975 F.3d 788, 810 (9th Cir. 2020) ("Section 1252(b)(9) is also

5    not a bar to jurisdiction . . . because claims challenging the legality of detention pursuant to an

6    immigration detainer are independent of the removal process.").

7           **ii.  *Section 1252(g)***

8           8 U.S.C. § 1252(g), unless other laws provide jurisdiction, strips all courts of jurisdiction

9    to hear "any cause or claim by or on behalf of any alien arising from the decision or action by the

10   Attorney General to commence proceedings, adjudicate cases, or execute removal orders against

11   any alien under this chapter." 8 U.S.C. § 1252(g). However, as interpreted by the Supreme Court,

12   this Section applies "only to three discrete actions that the Attorney General may take: her

13   'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders."

14   Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482 (1999) (emphasis in original).

15   Thus, § 1252(g) does not apply to "all claims arising from deportation proceedings." Id. Instead,

16   "[t]he Supreme Court has given a 'narrow reading' to § 1252(g)." Ibarra-Perez v. United States,

17   _ F.4th _, Bi, 24-631, 2025 WL 2461663 at *6 (9th Cir. Aug. 27, 2025). Moreover, the Ninth

18   Circuit has indicated that where a noncitizen challenges the Attorney General's arguably

19   discretionary decision on a purely legal basis as a "violation [of] the Constitution" or "INA,"

20   courts have jurisdiction to review such decisions as "premised on a lack of legal authority." Id. at

21   *8.  In any case, because Petitioner challenges the lawfulness of his detention during the

22   pendency of his removal proceedings, it is not a challenge to one of the "three discrete events

23   along the road to deportation" that § 1252(g) applies to. Reno, 525 U.S. at 482.

24          **iii.  *Section 1252(a)***

25          Under 8 U.S.C. § 1252, titled "Judicial Review of Orders of Removal," Subsection (a)(2)

26   contains a provision listing "[m]atters not subject to judicial review." See 8 U.S.C. § 1252(a)(2).

27   Petitioner is not challenging an order of removal, and neither §1226(a) or §1225(b)(2) are

28   included in the matters listed in that subsection, so § 1252(a) is not implicated here.

### iv.  *Section 1226(e)*

Although not raised in Respondents' briefing, Respondents counsel asserted at the Motion hearing that 8 U.S.C. § 1226(e) deprives this Court of authority to review Petitioner's challenge to the lawfulness of his continuing detention under § 1226 of the INA. 8 U.S.C § 1226(e) provides:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole.

As the Supreme Court in <u>Demore</u> affirmed "§ 1226(e) does not apply to suits challenging the framework for decisions rather than a discretionary decision itself made under 8 U.S.C. § 1226." <u>Demore v. Kim</u>, 537 U.S. 510, 516-17 (2003). Petitioner does not here challenge any discretionary decision made under § 1226, rather, Petitioner challenges Respondents use of its regulatory framework, including 8 C.F.R. § 1003.19(i)(2), to subject him to mandatory detention under § 1225, despite the decades of agency practice, established case law, and plain text of the INA, which he asserts demonstrate § 1226(a), not § 1226(b), applies to him and similarly situated noncitizens. It is well settled that § 1226(e) does not strip a district court of its traditional habeas jurisdiction to address a petition "challen[ing] the statutory framework that permits [the petitioner's] detention without bail." <u>Id.</u>

Further, "where Congress intends to preclude judicial review of constitutional claims" or "to bar habeas review," the Supreme Court "has required a particularly clear statement that such is Congress' intent." <u>Id.</u> at 517. Section 1226(e) is not a clear statement of Congress' intent to preclude all constitutional and habeas review of DHS decisions regarding a noncitizen's detention under that section, even where a Petitioner asserts the decision violates the statute itself and the U.S. Constitution. Further, the Ninth Circuit has held that while the Attorney General's "discretionary judgment" is not subject to review, claims that the discretionary process itself is legally and constitutional flawed are "cognizable in federal court on habeas because they fit comfortably within the scope of § 2241." <u>Gutierrez-Chavez v. INS</u>, 298 F.3d 825, 829 (9th Cir. 2002).

- 15 -

1    This Court's jurisdiction over the Petitioner's habeas Petition is further supported by the
2    Supreme Court's finding of jurisdiction in <u>Jennings</u>, wherein a class of noncitizens subject to
3    prolonged detention pending the completion of their removal proceedings, with no opportunity
4    for a bond hearing, asserted their detention was not authorized under 8 U.S.C. § 1225(b),
5    1226(a), 1226(c) or 1231(a). The Court again affirmed that "§1226(e) does not preclude
6    challenges to the statutory framework that permits the alien's detention without bail" and held a
7    challenge to "the extent of the Government's detention authority under the statutory framework
8    as a whole" did not implicate § 1226(e). <u>Jennings v. Rodriguez</u>, 583 U.S. 281, 295 (2018) (citing
9    <u>Demore</u>, 538 U.S. at 516). Because Petitioner challenges the extent to which Respondents' new
10   detention policy is authorized under the INA, § 1226(e) does not bar review.

11       In sum, the basic federal habeas corpus statute grants this Court authority to resolve
12   Petitioner's challenge to the lawfulness of his detention under the INA, APA, and Constitution,
13   and none of the jurisdictional stripping provisions of the INA apply to Petitioner's challenge to
14   Respondents' detention policy before this Court. <u>See</u> <u>Zadvydas</u>, 533 U.S. at 699 (citing 28
15   U.S.C. § 2241(c)(3) (granting courts authority to determine whether detention is "in violation of
16   the ... laws ... of the United States").

17       **B. Administrative Exhaustion**

18       As another threshold matter, the Court addresses Respondents' assertion that the Court
19   must or alternatively should require Petitioner to await the BIA's resolution of DHS' appeal
20   before resolving the statutory and constitutional issues presented in his Petition. "Exhaustion can
21   be either statutorily or judicially required. If exhaustion is required by statute, it may be
22   mandatory and jurisdictional, but courts have discretion to waive a prudential requirement."
23   <u>Laing v. Ashcroft</u>, 370 F.3d 994, 998 (9th Cir. 2004). Neither the habeas statute, 8 U.S.C. §
24   2241, nor the relevant sections of the INS require petitioners to exhaust administrative remedies
25   before filing petitions for habeas corpus. <u>Id.</u> (citing <u>Castro-Cortez v. INS</u>, 239 F.3d 1037, 1047
26   (9th Cir. 2001)). Therefore, Respondents are incorrect that exhaustion is jurisdictionally
27   required, and this Court must instead exercise its discretion to determine whether exhaustion
28   should be required as a prudential matter. <u>Id.</u>

A court may require prudential exhaustion if: "(1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review." Puga v. Chertoff, 488 F.3d 812, 815 (9th Cir. 2007). Courts may however waive prudential exhaustion if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." Laing, 370 F.3d at 1000. Petitioner bears the burden of demonstrating at least one of the Laing factors applies. See Ortega-Rangel v. Sessions, 313 F.Supp.3d 993, 1003 (9th Cir. 2018).

First, the Court finds it would be nonsensical to hold Petitioner is required to await the BIA's resolution of DHS' appeal under the doctrine of prudential exhaustion. Petitioner *has* exhausted his administrative remedies—he sought review of his custody from an IJ pursuant to the procedural protections he is afforded under § 1226(a) and successfully established that he should be released on bond. The Petition asks this Court to enforce the IJ's bond order—requiring Petitioners to appeal to the BIA to *affirm* the IJ's order that he contends was legally correct would be irrational. In other words, it is Respondents, not Petitioner, who claim the administrative remedial scheme produced a mistaken outcome. The doctrine of prudential exhaustion is thus not implicated where DHS—not Petitioner—is the party asking the BIA to overturn the IJ's determination.

Nevertheless, to the extent the doctrine of prudential exhaustion would apply to prevent this Court from deciding the statutory issue of whether 8 U.S.C. § 1225(b)(2) as compared to § 1226(a) applies to Petitioner, the Court finds exhaustion would be futile.[6] In Matter of Yajure

---

[6] In addition to futility, the Court notes the Puga factors also weigh against requiring prudential exhaustion, because (1) neither agency expertise nor an administrative appellate record is necessary to determine the purely legal questions presented by Petitioner's challenge to the Government's novel mandatory detention policy; (2) the deliberate bypass of administrative procedures cannot be avoided where the BIA has adopted DHS' reinterpretation of the INA, and thereby upended decades of settled agency practice, and the class-wide declaratory and injunctive relief requested by Petitioner would resolve the concerns regarding judicial efficiency;

1   Hurtado, 29 I&N Dec. 216 (BIA 2025), the BIA indicated it has adopted DHS' reading of the

2   INA consistent with the July 8, 2025 Notice. Accordingly, that the BIA will reverse IJ Baker's

3   bond order as to Petitioner and accept DHS' interpretation of § 1225(b)(2) is effectively a

4   foregone conclusion, and exhaustion should not be required. See Vasquez-Rodriguez v. Garland,

5   7 F.4th 888, 896 (9th Cir. 2021) ("We will excuse a failure to exhaust if it is very likely what

6   [the BIA's] result would have been. Thus, where the agency's position appears already set and

7   recourse to administrative remedies is very likely futile, exhaustion is not required.") (cleaned

8   up) (internal citations and quotations omitted); see also Mosqueda v. Noem, No. 5:25-CV-02304

9   CAS (BFM), 2025 WL 2591530, at *7 (C.D. Cal. Sept. 8, 2025) (waiving exhaustion as futile

10  because "the most recent BIA decision on this issue has adopted the legal interpretation of the

11  new DHS policy that petitioners challenge.") (citing Matter of Yajure Hurtado, 29 I.&N. Dec.

12  216 (BIA Sept. 5, 2025)). And importantly, the value of administrative review is minimal here,

13  "where the statutory interpretation question at the center of this case must be resolved by a

14  judicial decision on the merits." Id. (citing Loper Bright Enters. v. Raimando, 603 U.S. 369

15  (2024)). Because, as discussed below, this Court finds the BIA has adopted a policy that likely

16  violates federal law, awaiting the BIA's decision regarding Petitioner is futile.

17       Additionally, the Court finds that there is no mechanism to seek administrative review of

18  the constitutionality of DHS' automatic stay via C.F.R. § 1003.19(i)(2), so exhaustion would

19  likewise be futile. The regulation on its face allows for at least 90 days of unreviewable

20  detention. By the time the BIA resolves DHS' appeal, Petitioner will have been subject to

21  extended detention violative of his due process rights. This matter thus falls squarely into the

22  futility exception to the exhaustion requirement "carved for constitutional challenges to . . .

23  [DHS] procedures." Iraheta-Martinez v. Garland, 12 F.4th 942, 949 (9th Cir. 2021) (quoting Sola

24

---

25  and (3) administrative review will not result in the agency correcting its own mistake, as the BIA
    has adopted DHS' interpretation of the INA. See e.g., Hernandez v. Sessions, 872 F.3d 976, 988-
26  89 (9th Cir. 2017) (holding prudential exhaustion was properly waived where an administrative
    appellate record "is not necessary to resolve the purely legal questions presented" by the
27  plaintiff's "challenge to the government's policy," resolving those questions would reduce the
    need for bypass of administrative procedures, and the BIA's position on the legal questions was
28  already set).

v. Holder, 720 F.3d 1134, 1135 (9th Cir. 2013) (*per curiam*)) (alterations in original)). As to due process claims in particular, "[t]he key is to distinguish the procedural errors, constitutional or otherwise, that are correctable by the administrative tribunal from those that lie outside the BIA's ken." Sola, 720 F.3d at 1135. See also Matter of G.K., 26 I. & N. Dec. 88, 96-97 (BIA 2013) (explaining that "[n]either the [BIA] nor the Immigration Judges have the authority to rule on the constitutionality of the statutes we administer[.]"); Coyt v. Holder, 593 F.3d 902, 905 (9th Cir. 2010) (permitting judicial review of constitutional challenge to regulation because BIA lacks authority over the question).

Moreover, requiring Petitioner to be subjected to unconstitutional detention pending the BIA's decision would cause irreparable harm, which is a separate basis to waive exhaustion under Laing. See Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013) (finding irreparable harm in continued detention of noncitizens who would likely be granted conditional release if afforded a bond hearing). Because Petitioner's constitutional challenge to his detention is necessarily beyond the scope of the BIA's review, the BIA has already indicated it has adopted DHS' new interpretation of the INA, and awaiting the BIA's decision would result in irreparable harm to Petitioner, prudential administrative exhaustion—to the extent it should apply where DHS, not Petitioner, is asserting the IJ's decisions was erroneous—is excused as futile.

## C. Preliminary Injunction

The Court now turns to the analysis of whether Petitioner has satisfied the requirements for preliminary injunctive relief. As discussed below, because the Court finds Petitioner is likely to succeed on the merits of his Petition on the basis that his continued detention is unlawful, or, at a minimum, that there are serious questions on the merits of his challenge, and the remaining Winter factors weigh strongly in his favor, the Court finds preliminary relief is warranted.

### i. *Likelihood of Success or Serious Questions*

First, the Court finds Petitioner has satisfied the most important Winter factor: he is likely to succeed on the merits of his Petition for Writ of Habeas Corpus, because (1) § 1226(a), not § 1225(b)(2), applies to him, and therefore his detention without bond violates the INA and (2) Respondents' continued detention of Petitioner pursuant to the automatic stay of IJ Baker's bond

1    release order under 8 C.F.R. §1003.19(i)(2) violates his procedural and substantive due process

2    rights. See Matsumoto v. Labrador, 122 F.4th 787, 804 (9th Cir. 2024) (Likelihood of success on

3    the merits is the most important factor in a preliminary injunction analysis); see also Baird v.

4    Bonta, 81 F.4th 1036, 1042 (9th Cir. 2023) (likelihood of success is especially important where a

5    plaintiff seeks a preliminary injunction because of an alleged constitutional violation).

6                               1.   The Statutory Question

7             First, Respondents argue that while "the current operative mechanism" of Petitioner's

8    detention is an automatic stay under 8 C.F.R. § 1003.19(i)(2), "this confinement is statutorily

9    authorized by 8 U.S.C. § 1225(b)(2), which requires detention throughout his entire removal

10   proceedings." ECF No. 15 at 7. In Herrera Torralba, this Court previously found that the

11   petitioners' continued detention pursuant to 8 C.F.R. § 1003.19(i)(2) presented the "narrow

12   issue" of whether the automatic stay was constitutional, and therefore did not necessitate

13   intervention into the administrative appellate process to grant the writ of habeas corpus. See Case

14   No. 2:25-cv-01366-RFB-DJA, ECF No. 32 at *11-12. On the evening of that ruling, the BIA

15   issued a decision ratifying DHS' reinterpretation of the INA. See Matter of Hurtado, 29 I&N

16   Dec. 216 (BIA 2025). Because this indicates the BIA will ultimately reverse IJ Baker's bond

17   release order, and the Court would then be called on to resolve the statutory issue as applied to

18   Petitioner, the Court now undertakes the statutory analysis it previously declined to decide. For

19   the following reasons the Court holds, consistent with the overwhelming majority of district

20   courts in the Ninth Circuit and across the country that have thus far considered the issue,[7] that §

21   _____

22            [7] See e.g., Bautista v. Noem, No. 5:25-cv-01873-SSS-BFM, ECF No. 14 at * 7-8 (C.D.
      Cal. July 28, 2025) (holding respondents failed to articulate any valid justification, legal or
23    otherwise, for the application of § 1225 rather than § 1226 to the petitioners); Rodriguez v.
      Bostock, 779 F. Supp. 3d 1239 (W.D. Wash. 2025) (finding that the text of § 1226, canons of
24    statutory interpretation, legislative history, and longstanding agency practice indicate that §
      1226, not § 1225(b)(2), applies to noncitizens arrested while living in the U.S.); Ceja Gonzalez v.
25    Noem, No 5:25-cv-02054-ODW (C.D. Cal. Aug. 13, 2025) (rejecting the respondents'
      interpretation of § 1225(b) based on the statutory text); Rosado v. Figueroa, No. CV 25-02157
26    PHX DLR (CDB), 2025 WL 2337099, at *8 (D. Ariz. Aug. 11, 2025), report and
      recommendation adopted sub nom. Rocha Rosado v. Figueroa, No. CV-25-02157-PHX-DLR
27    (CDB), 2025 WL 2349133 (D. Ariz. Aug. 13, 2025) (same); Martinez v. Hyde, No. CV 25-
      11613-BEM, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025) (holding DHS's selective
28    reading of section 1225—which ignores its "seeking admission" language—violates the rule

1226, not § 1225, applies to Petitioner and others similarly situated.

As the Ninth Circuit has noted, the INA has been compared to a "morass," a "Gordian knot," and "King Minos's labyrinth in ancient Crete." Torres v. Barr, 976 F.3d 918, 923 (9th Cir. 2020). Divining its meaning is "ordinarily not for the faint of heart." Id. As relevant here, the statute must be read against the backdrop of "our constitutional principles." Id. (citing Zadvydas, 533 U.S. at 690-99). And despite the BIA's recent decision in Matter of Hurtado, the task of resolving this issue belongs to the independent judgment of the courts. Loper Bright Enters. v. Raimando, 603 U.S. 369, 385 (2024) ("When the meaning of a statute [is] at issue, the judicial role [is] to interpret the act of Congress, in order to ascertain the rights of the parties.") (internal quotation marks and citation omitted).

a.   Plain Meaning

The first step of interpreting the relevant INA provisions is to determine "the plain meaning of the statute." Torres, 976 F.3d at 923 (citing Esquivel-Quintana v. Sessions, 581 U.S. 385, 391 (2018) ("We begin, as always, with the text.")). First, the title of § 1225 indicates that it concerns "inspection by immigration officers," and "expedited removal of inadmissible arriving aliens." 8 U.S.C. § 1225. Paragraph (b)(1) of that Section sets forth the procedure for inspection of "aliens arriving in the United States and certain other aliens who have not been admitted or paroled." Id., § 1225(b)(1). Paragraph (b)(1) goes on to encompass "an alien . . . who is arriving in the United States," and other "certain other aliens" designated by the Attorney General "who [have] not been admitted or paroled into the United States" and "who [have] not affirmatively shown . . . that [they have] been physically present in the United States continuously for the 2-

---

against surplusage and negates the plain meaning of the text); Maldonado v. Olson, No. 25-CV-3142 (SRN/SGE), 2025 WL 2374411, at *12 (D. Minn. Aug. 15, 2025) (holding that accepting DHS's "one-size-fits-all application of § 1225(b)(2) to all aliens, with no distinctions, would violate fundamental canons of statutory construction" . . . and "render § 1226 utterly superfluous" and that the "Laken Riley Act amendments to § 1226(c), the legislative history of the IIRIRA, and longstanding practice supports this holding."); Lopez Benitez v. Francis, No. 25 CIV. 5937 (DEH), 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025) (holding a proper understanding of the relevant statutes, in light of their plain text, and uniform case law interpreting them, compels the conclusion that § 1225 does not apply to a noncitizen who has been residing in the U.S. for more than two years); see also Reyes v. Raycraft,, No. 25-CV-12546, 2025 WL 2609425 (E.D. Mich. Sept. 9, 2025); Vazquez Garcia v. Noem, No. 25-CV-02180, 2025 WL 254931 (S.D. Cal. Sept. 3, 2025)

year period immediately prior to the determination of inadmissibility." Id. Paragraph (b)(1) sets

forth a process for expedited removal of the above-described classes of noncitizens. Id.

Section 1225(b)(2), the provision at issue here, concerns "Inspection of other aliens" not

covered by Paragraph (b)(1). Paragraph (b)(2)(A) states:

> [I]n the case of an alien who is an applicant for admission, if the
> examining immigration officer determines that an alien seeking
> admission is not clearly and beyond a doubt entitled to be
> admitted, the alien shall be detained for a proceeding under section
> 1229a of this title.

By its plain text, § 1225(b)(2) thus applies where several conditions are met: (1) an "examining

immigration officer" in the context of "inspection" (2) determines that an individual is an

"applicant for admission" who is (3) "seeking admission." Section 1225(a)(1) defines "aliens

treated as applicants for admission" for purposes of "inspection" under this Section as follows:

> An alien present in the United States who has not been admitted or
> who arrives in the United States (whether or not at a designated
> port of arrival and including an alien who is brought to the United
> States after having been interdicted in international or United
> States waters) shall be deemed for purposes of this chapter an
> applicant for admission.

To reiterate, § 1225(b)(2)(A) narrows the above broader definition of "applicants for admission"

and applies in the context of (1) "inspection" by an "examining immigration officer" only to (2)

"applicants for admission" as defined above, who are (3) "seeking admission," and (4) whom §

1225(b)(1) does not address. Respondents assert that this definition of "applicant for admission"

is the key provision, and necessarily encompasses any noncitizen in the U.S. who has not been

admitted, no matter how long they have resided in the U.S. But as the Ninth Circuit held in

interpreting the phrase "applicant for admission" within the context of the application of §

1225(b)(1) to a noncitizen who was placed in expedited removal proceedings thirteen years after

entry, "an immigrant submits an 'application for admission' at a distinct point in time" and

"stretching the phrase" to continue "potentially for years or decades" "would push the statutory

text beyond its breaking point." U.S. v. Gambino-Ruiz, 91 F.4th 981, 988-89 (9th Cir. 2024)

(citing Torres v. Barr, 976 F.3d 918, 922-26 (9th Cir. 2020) (en banc)). The Court is thus

skeptical that Petitioner and other similarly situated noncitizens who have resided in the U.S. for

years are properly characterized as a perpetual "applicant for admission" under the plain meaning of the statute.

Moreover, Respondents' sweeping and unlimited reading of "applicants for admission" ignores the fact that that term is further limited in §1225(b)(2) by the active construction of the phrase "seeking admission" which entails some kind of affirmative action taken to obtain authorized entry. See e.g., Martinez v. Hyde, No. CV 25-11613-BEM, 2025 WL 2084238 (D. Mass. July 24, 2025); see also Lopez Benitez v. Francis, No. 25 CIV. 5937 (DEH), 2025 WL 2371588 at *7 (S.D.N.Y. Aug. 13, 2025). It is inconsistent with the plain, ordinary meaning of the phrase "seeking admission" to apply this section to all noncitizens already present and residing in the U.S., regardless of whether they are taking any affirmative acts that constitute "seeking admission." As the Lopez Benitez court analogized, "someone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as 'seeking admission' to the theater." Id. at *7.

Accordingly, the Court finds that the statutory text indicates that for purposes of mandatory detention under § 1225(b)(2)(A), the phrases "applicants for admission" and "seeking admission," taken together, are limited in temporal scope, and cannot be read to apply indefinitely to all noncitizens residing in the U.S. for years or decades. In contrast, Respondents reading effectively ignores the phrase "seeking admission" and asserts only the phrase "applicants for admission" controls. See ECF No. 15 at 12. But that interpretation, which relies on conflating the phrases "applicants for admission" and "seeking admission" as "synonymous," see id., would render the phrase "seeking admission" redundant, and as Respondents acknowledge "[o]ne of the most basic interpretative canons instructs that a 'statute should be construed so that effect is given to all its provisions.'" Id. (quoting Corley v. United States, 556 U.S. 303, 314 (2009) (alterations in original).

Section 1225's limited temporal focus is further evident in other provisions of § 1225 which suggest Congress' focus was on ports of entry or recent arrivals, not longtime noncitizen residents intercepted far from any border. See K Mart Corp. v. Cartier, Inc., 488 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statue, the court must look to the particular

statutory language at issue, as well as the language and design of the statute as a whole.") (citations omitted); see also Biden v. Texas, 597 U.S. 785, 799-800 (2022) (evaluating statutory structure to inform interpretation of the INA). For example, § 1225's title refers to the "inspection" of "inadmissible arriving" noncitizens, while its subsections set forth procedures for "examining immigration officer[s]" §§ 1225(b)(2)(A), (b)(4), to engage in "[i]nspection[s]" of individuals "arriving in the United States," §§ 1225(a)(3), (b)(1), (b)(2), (d). As such, the Court finds the structure of § 1225(b)(2) further indicates that it authorizes mandatory detention for noncitizens entering, attempting to enter, or who have recently entered the U.S., and does not encompass individuals like Petitioner, who entered long ago, are not taking affirmative steps that could be characterized as "seeking admission," and have been residing in the U.S. for years.

This is further consistent with Supreme Court precedent interpreting § 1225(b) and finding it "applies primarily to aliens seeking entry into the United States ('applicants for admission' in the language of the statute)." Jennings, 583 U.S. at 297. A noncitizen like Petitioner, who has already entered and is present in the country, simply cannot be characterized as "seeking entry" consistent with the ordinary meaning of that phrase. See Dept. of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 140 (2020) (finding "an alien who tries to enter the country illegally is treated as an 'applicant for admission,'" pursuant to § 1225(a)(1)).

This reading of § 1225 as applying only to arriving or recently arriving noncitizens is further supported when considered in comparison to § 1226. The title of § 1226 indicates it concerns "apprehension and detention of aliens." 8 U.S.C. § 1226. Section 1226(a) "applies to aliens already present in the United States" and "creates a default rule for those aliens by permitting—but not requiring—the Attorney General to issue warrants for their arrest and detention pending removal proceedings." Jennings, 583 U.S. at 303. Noncitizens like Petitioner, who are charged with entering the country without inspection and thus inadmissible and removable, see 8 U.S.C § 1182(a)(6)(A)(i), are covered by the statute during the pendency of their removal proceedings. See id. § 1229a(a)(3) (providing that removal proceedings determine whether a noncitizen has been or may be admitted or removed from the U.S.); see also Jennings, 583, U.S. at 288 (§ 1226 "generally governs the process of arresting and detaining" noncitizens

1    who are deportable under § 1227(a), including "aliens who were inadmissible at the time of

2    entry. . .").

3          The structure of § 1226 further demonstrates it applies to noncitizens charged as

4    "inadmissible" under the INA, like Petitioner, because subsection § 1226(c) carves out discrete

5    categories of noncitizens subject to mandatory detention, including noncitizens who are

6    "inadmissible for entering without inspection" *and* who have been charged with or convicted of

7    certain crimes. Id. § 1226(c)(1)(E); see Shady Grove Orthopedic Associates, P.A. v. Allstate Ins.

8    Co., 559 U.S. 393 (2010) (holding that when "Congress has created specific exceptions" to a rule

9    it "proves" the rule applies generally, because otherwise "the statutory exceptions would be

10   unnecessary.") Accepting Respondents' reading would render the exceptions of § 1226 that

11   apply to certain categories of inadmissible noncitizens superfluous or meaningless. Shulman v.

12   Kaplan, 58 F.4th 404, 410–11 (9th Cir. 2023) ("a court must interpret the statute as a whole,

13   giving effect to each word and making every effort not to interpret a provision in a manner that

14   renders other provisions of the same statute inconsistent, meaningless or superfluous.") (citation

15   and quotation marks omitted).

16         Additionally, the fact that the Laken Riley Act amended § 1226(c) to add additional

17   categories of noncitizens who are subject to mandatory detention indicates that § 1226(a) applies

18   to noncitizens charged as inadmissible by default. See Gieg v. Howarth, 224 F.3d 775, 776 (9th

19   Cir. 2001) ("When Congress acts to amend a statute, [courts] presume it intends its amendments

20   to have real and substantial effect."); see also Diaz Martinez, 2025 WL 2084238, at *7 ("if, as

21   the Government argue[s], . . . a noncitizen's inadmissibility were alone already sufficient to

22   mandate detention under section 1225(b)(2)(A), then the 2025 amendment would have no

23   effect").

24         Respondents assert that there is "an irreconcilable conflict in two legal provisions," and

25   because § 1225(b)(2) is more specific than § 1226(a), "the specific governs over the general."

26   ECF No. 15 at 12 (quoting Karczewski v. DCH Mission Valley LLC, 862 F.3d 1006, 1015 (9th

27   Cir. 2017)). They effectively suggest § 1226 should be read out of the INA as irreconcilable with

28   § 1225(b)(2). But the differences between § 1225 and § 1226 do not indicate the former should

1    prevail over the latter—rather, they indicate that Congress intended for different classes of

2    noncitizens to be subject to each provision, *i.e.*, mandatory versus discretionary detention. As the

3    Ninth Circuit observed, "§ 1226(a) stands out from the other immigration detention provisions in

4    key respects." Rodriguez Diaz v. Garland, 53 F.4th 1189, 1202 (9th Cir. 2022) (noting that §

5    1226(a) and its implementing regulations "provide extensive procedural protections that are

6    unavailable under other detention provisions."). The procedural protections for a detainee under

7    § 1226(a) include "an initial bond hearing before a neutral decisionmaker, the opportunity to be

8    represented by counsel and to present evidence, the right to appeal, and the right to seek a new

9    hearing when circumstances materially change." Id. None of these protections are available

10   under § 1225. This does not render the two provisions irreconcilable, rather, the statutory scheme

11   subjects some classes of noncitizens to mandatory detention under § 1225, and subjects others—

12   namely noncitizens who are present and have resided in the U.S. for an extended period—to

13   permissive detention. See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc., 778 F.3d 1059,

14   1081 (9th Cir. 2015) ("permissive and mandatory descriptions are in harmony, as they apply to

15   different situations.").

16                          b.   Legislative History

17        To the extent the above does not resolve the statutory question, the Court finds the

18   legislative history further supports interpreting the INA as subjecting noncitizens like Petitioner

19   to discretionary detention with the associated procedural protections. In enacting IRRIRA,

20   Congress specified that § 1226(a) simply restated the discretionary detention authority applicable

21   to all noncitizens *present* in the U.S. pending deportability proceedings, formerly codified at 8

22   U.S.C. § 1252(a) (1994). H.R. Rep. No. 104-469, pt. 1, at 229; see also H.R. Rep. No. 104-828,

23   at 210 (same). Further, Congress passed IIRRIRA under the backdrop of longstanding precedent

24   which recognized "[t]he distinction between an alien who has effected an entry into the United

25   States and one who has never entered" which "runs throughout immigration law;" a distinction

26   that recognizes *arriving* noncitizens have less due process protections than those present and

27   residing within the country's borders. See, Zadvydas, 533 U.S. at 693–94 (collecting cases

28   setting forth this longstanding distinction); id. at 693 ("an alien who is detained shortly after

1    unlawful entry cannot be said to have 'effected an entry.'").

2    And to the extent Respondents' proffered reading of § 1225 can be characterized as

3    plausible under the text of the statute, the canon of constitutional avoidance counsels against

4    such a reading. "Serious constitutional concerns" arise from the subjection of Petitioner to

5    mandatory detention, considering the due process rights which noncitizen residents present in the

6    U.S. have and the lack of procedural protections within the mandatory detention scheme. See

7    Rodriguez Diaz, 53 4th at 1198-99 (explaining that "where after the application of ordinary

8    textual analysis, the statute is found to be susceptible of more than once construction" the canon

9    of constitutional avoidance instructs courts to construe the statute to avoid constitutional

10   problems) (citing Zadvydas, 533 U.S. at 682; Jennings, 538 U.S. at 296).

c.   Agency Practice

12   "[T]he longstanding practice of the government—like any other interpretive aid—can

13   inform [a court's] determination of what the law is." Loper Bright, 603 U.S. at 386 (cleaned up).

14   The fact that Respondents' reading is inconsistent with existing regulations governing IJs' bond

15   jurisdiction, as well as decades of agency practice, is further persuasive evidence that Petitioner

16   and those similarly situated continue to be subject to discretionary detention under § 1226(a).

17   See e.g., 8 C.F.R. § 1003.19(h)(2) (limiting an IJ's bond jurisdiction only over certain classes of

18   noncitizens such as arriving noncitizens and those encompassed under § 1226(c)). Likewise,

19   Respondents' reading of § 1225 is undermined by the fact that it vests immensely expanded

20   detention authority in DHS—a shift of "vast economic and political significance"—while

21   contravening decades of consistent agency practice applying § 1226(a) to noncitizens like

22   Petitioner. See e.g., Util. Air Regul. Grp. V. EPA, 573 U.S. 302, 324 (2014) ("When an agency

23   claims to discover in a long-extant statute an unheralded power. . . [the courts] typically greet its

24   announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to

25   assign to an agency decisions of vast economic and political significance.")  (citations omitted).

26   Historically, noncitizens who resided in the United States, but who had previously

27   entered without inspection, were not deemed "arriving aliens" under § 1225(b) but were instead

28   subject to § 1226(a). See Jennings, 583 U.S. at 287 ("In sum, U.S. immigration law authorizes

the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in* the country pending the outcome of removal proceedings under §§ 1226(a) and (c).") (emphasis added); Rodriguez v. Bostock, 779 F.Supp.3d 1239, 1259 (W.D. Wash. 2025) (noting ICE's "longstanding agency practice [of] applying § 1226(a) to inadmissible noncitizens already residing in the country."). Consistent with longstanding agency practice, noncitizens already residing in the county, such as Petitioner, were placed in standard removal proceedings and received bond hearings, unless their criminal histories rendered them ineligible under § 1226(c). See Jennings, 583 U.S. at 288.

And as discussed above, Congress enacted the Laken Riley Act against this backdrop of longstanding agency practice applying § 1226(a) to inadmissible noncitizens already residing in the country. Another "customary interpretive tool" is the principle that "[w]hen Congress adopts a new law against the backdrop of a 'longstanding administrative construction,'" courts "generally presume the new provision should be understood to work in harmony with what has come before." Monsalvo Velazquez v. Bondi, 145 S.Ct. 1232, 1242 (2025) (quoting Haig v. Agee, 453 U.S. 280, 297–98 (1981)). In Monsalvo Velazquez, while recognizing that "[i]n truth, the statute is susceptible to both understandings," the Supreme Court interpreted a deadline expressed in terms of "days" in § 1229c of the INA to "extend deadlines falling on a weekend or legal holiday to the next business day," rather than counting "every calendar day." Id. at 1242. The Court adopted this interpretation because Congress enacted the relevant subsection "against the backdrop of [a] consistent, longstanding administrative construction" giving this specialized meaning to the term "day." Id. Similarly, here, Congress adopted the Laken Riley amendments to § 1226(c) against the backdrop of decades of post-IIRIRA agency practice applying discretionary detention under § 1226(a) to inadmissible noncitizens like Petitioner. It is therefore presumed that Congress intended "the same understanding." See id.

In sum, the Court finds that the text and canons of statutory interpretation, including the legislative history, regulations, and long history of consistent agency practice, as well as the doctrine of constitutional avoidance, demonstrate that Petitioner is likely to succeed in

1  establishing he and similarly situated noncitizens are subject to detention under § 1226(a) and its

2  implementing regulations, not § 1225(b)(2)(A).

3  2.  Due Process

4     Petitioner additionally raises both a procedural and substantive due process challenge to

5  his continued detention pursuant to DHS's invocation of the automatic stay under 8 C.F.R. §

6  1003.19(i)(2). The Court previously found the regulation facially violative of a detainees'

7  procedural due process rights, and its reasoning and holding applies with equal force in this case

8  and is fully incorporated by reference herein. See Herrera Torralba, Case No. 2:25-cv-1366-

9  RFB-DJA, ECF No. 32 at *14-19 (Sept. 5, 2025). As discussed below, the Court further finds the

10  automatic stay violates Petitioner's due process rights as applied to him.

11     The Due Process Clause prohibits deprivations of life, liberty, and property without due

12  process of law. See U.S. CONST., amend. V. There is no question that these protections extend to

13  noncitizens present in the United States. See e.g., Trump v. J.G.G., 604 U.S. _, 145 S. Ct. 1003,

14  1006 (2025) (per curiam) ("'It is well established that the Fifth Amendment entitles aliens to due

15  process of law' in the context of removal proceedings . . .") (quoting Reno v. Flores, 507 U.S.

16  292, 306 (1993)); Zadvydas v. Davis, 533 U.S. 678, 693, (2001) ("[T]he Due Process Clause

17  applies to all 'persons' within the United States, including aliens, whether their presence here is

18  lawful, unlawful, temporary, or permanent."); Hussain v. Rosen, 985 F.3d 634, 642 (9th Cir.

19  2021) (holding the "Fifth Amendment entitles aliens to due process of law in deportation

20  proceedings.").

21     A constitutional due process challenge can be either facial, as applied, or both. See

22  Rodriguez Diaz, 53 F.4th at 1203. A facial challenge is "a claim that the legislature [or

23  administrative agency] has violated the Constitution" meaning that "the plaintiff must show that

24  no set of circumstances exists under which the statute would be valid." Id. (internal quotation

25  and citations omitted). "An as-applied challenge, meanwhile, 'focuses on the statute's [or

26  regulation's] application to the plaintiff' and requires the court to only assess the circumstances

27  of the case at hand." Id. (quoting Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr., 979

28  F.3d 1209, 1217 (9th Cir. 2020).) Regardless of the type of challenge, however, the underlying

constitutional standard remains the same. Regino v. Staley, 133 F.4th 951, 967 (9th Cir. 2025) (citing Legal Aid Servs. of Or. v. Legal Servs. Corp., 608 F.3d 1084, 1096 (9th Cir. 2010))

Noncitizen detainees charged with being in the U.S. illegally are entitled to procedural due process, meaning "notice and opportunity to be heard 'appropriate to the nature of the case.'" J.G.G., 145 S.Ct. at 1006; see also A. A. R. P. v. Trump, 145 S. Ct. 1364, 1367 (2025). Due process "is a flexible concept that varies with the particular situation." Zinermon v. Burch, 494 U.S. 113, 127 (1990). "[T]he government's discretion to incarcerate noncitizens is always constrained by the requirements of due process." Hernandez v. Sessions, 872 F.3d 976, 981 (9th Cir. 2017).

To determine whether detention violates procedural due process, courts apply the three-part test set forth in Mathews v. Eldridge, 424 U.S. 319 (1976). See Rodriguez Diaz v. Garland, 53 F.4th 1189, 1206 (9th Cir. 2022) (collecting cases and applying the Mathews test to a constitutional challenge to detention pursuant to 8 U.S.C. § 1226(a)). Under Mathews, courts weigh the following three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335.

Substantive due process protects individuals from government action that interferes with fundamental rights. See Regino, 133 F.4th at 959–60. Governmental action that infringes a fundamental right is constitutional only if "the infringement is narrowly tailored to serve a compelling state interest." Reno, 507 U.S. at 302. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process Clause] protects." Zadvydas, 533 U.S. at 690. Substantive due process thus protects noncitizens from arbitrary Government confinement, which violates a noncitizen's substantive due process rights except in certain "special and narrow nonpunitive circumstances where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." Id. at 690 (internal quotations omitted) (quoting Foucha v.

1    Louisiana, 504 U.S. 71, 80 (1992); Kansas v. Hendricks, 521 U.S. 346, 356 (1997)).

2            Before turning to the procedural and substantive due process analysis of the automatic

3    stay, the Court fist addresses Respondents' arguments in defense of the stay. Respondents

4    generally assert that Petitioner's continued detention pursuant to the stay does not offend due

5    process because Congress has authorized mandatory detention of noncitizens pending the

6    resolution of their removal proceedings under § 1225. As discussed above, the Court finds §

7    1226 and its associated procedural protections apply to Petitioner, including under the canon of

8    constitutional avoidance, therefore the application of § 1225 to prolong Petitioner's detention

9    after he has been ordered released on bond is likely both unlawful under the INA and raises

10   serious constitutional concerns.

11           As Respondents' citations emphasize, mandatory detention is permitted only to "some

12   classes of aliens" . . . to "give[] immigration officials time to determine an alien's status without

13   running the risk of the alien's either absconding or engaging in criminal activity before a final

14   decision can be made." See ECF No. 15 (citing Jennings, 583 U.S. at 286). But Respondents

15   have presented no evidence that Petitioner, who has deep financial, familial, and community ties

16   in the U.S. established through his near twenty years of residence, and a clean criminal record,

17   poses any risk of flight or criminal activity. Indeed, IJ Baker considered the evidence presented

18   by Petitioner and Respondents and found there was no such risk. To the extent Respondents

19   argue "Congress simply made the decision to detain [him] pending removal," see ECF No. 15 at

20   10-11, the argument is unavailing because it depends on acceptance of the statutory

21   interpretation this Court has already rejected and contravenes the indications of congressional

22   intent discussed above. Moreover, Respondents' statutory argument fails to acknowledge that

23   Petitioner is currently detained based on the unilateral decision to invoke the automatic stay by

24   DHS—an administrative regulation that was not enacted by Congress and raises distinct due

25   process concerns as discussed below.

26           Respondents next claim that the Court should presume Petitioner's continued detention is

27   constitutional based on the six-month presumption set forth in Zadvydas. 533 U.S. at 701. But

28   Zadvydas concerned an entirely separate provision of the INA regarding detention authority *after*

1   a final order of removal has been issued, pursuant to 8 U.S.C. § 1231(a)(2). While the Supreme

2   Court held that detention *following* a final removal order can be presumed constitutional for a

3   period of six months, it also interpreted the statutory provision "to avoid a serious constitutional

4   threat" and held "once removal is no longer reasonably foreseeable, continued detention is no

5   longer authorized by statute." Id. at 698. The decision also relied on the fact that "[w]hile

6   removal proceedings are in progress, most aliens may be released on bond . . .." Id. at 683 (citing

7   8 U.S.C § 1226(a)). Accordingly, the fact that Petitioner has been detained for less than six

8   months is inapposite; while his removal proceedings are ongoing, he is entitled to release on

9   bond, and removal cannot be said to be foreseeable under Zadvydas.

10          The Court now turns to the procedural and substantive due process analysis of

11  Petitioner's continued detention pursuant to the automatic stay.

12                                a.   Procedural Due Process

13          Respondents assert no argument regarding the procedural question presented by the

14  Petition: whether a regulation can permit an agency official to unilaterally detain a person after a

15  judge has ordered the person's release. Respondents require authority for two separate acts of

16  detention—both of which require valid authority and due process. The initial detention of

17  Petitioners was authorized pursuant to ICE's authority to seize or detain individuals based upon

18  ICE's determination that they are not lawfully in the United States. 8 U.S.C. §§ 1226, 1225,

19  1229a. However, once Petitioner was detained, he had the right under 8 C.F.R. § 1003.19(e),

20  which he invoked, to seek a custody redetermination after this initial seizure. Petitioner secured

21  his release based upon a decision of the IJ, who found § 1226(a) applied to Petitioner, and set

22  bond conditions. Prior to his release, ICE effected a second detention by invoking the automatic

23  stay under 8 C.F.R. § 1003.19(i)(2). Respondents' fail to address that there are two separate acts

24  of detention, asserting instead that the authority and process for the first detention necessarily

25  includes the second. The application of the automatic stay is itself a separate act of detention that

26  must also satisfy due process. The Court thus proceeds to its procedural due process analysis of

27  the automatic stay pursuant to 8 C.F.R. § 1003.19(i)(2) under Matthews.

28          ///

i.   The Private Interest

The first <u>Mathews</u> factor considers the private interest affected by DHS' invocation of the automatic stay. <u>See Mathews</u>, 424 U.S. at 335. Here, that is Respondent's interest in being free from imprisonment, "the most elemental of liberty interests." <u>Hamdi</u>, 542 U.S. at 529. In this country liberty is the norm and detention "is the carefully limited exception." <u>United States v. Salerno</u>, 481 U.S. 739, 755 (1987); <u>see also</u> <u>Rodriguez Diaz</u>, 53 F.4th At 1207 ("An individual's private interest in freedom from prolonged detention is unquestionably substantial.") (citations omitted).

The automatic stay necessarily always infringes on a noncitizen's fundamental right to freedom from Government detention, and therefore, this factor weighs heavily against the Government whenever it is invoked. Petitioner's as applied challenge is further bolstered by the individualized harms attendant to his incarceration—including being separated from his family and young children, losing the ability to run his business and earn an income which his family depends on, mental and emotional distress, and difficulty communicating with his counsel and gathering evidence in preparation for his removal proceedings. Petitioner has thus clearly established that the first <u>Mathews</u> factor weighs strongly in his favor.

ii.   The Risk of Erroneous Deprivation

The second <u>Mathews</u> factor is "the risk of an erroneous deprivation of [Petitioner's] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." <u>Mathews</u>, 424 U.S. at 335. This Court finds the automatic stay provision creates an extreme risk of erroneous and arbitrary confinement. <u>See e.g.</u>, <u>Günaydin v. Trump</u>, No. 25-CV-01151 (JMB/DLM), 2025 WL 1459154 (D. Minn. May 21, 2025) (concluding § 1003.19(i)(2) creates a substantial risk of erroneous deprivation of a detainee's interest in being free from arbitrary confinement).

The risk of erroneous deprivation of a noncitizen's liberty interest when DHS invokes the automatic stay is extraordinarily high for a few reasons. First, the text of the regulation provides no identifiable standard that would guide any purported due process procedures. <u>See</u> 8 C.F.R. § 1003.19(i)(2). The regulation simply states that it may be invoked "[i]n any case in which DHS

has determined that an alien should not be released or has set a bond of $10,000 or more." Id. Such an undefined and subjective standard clearly creates a likelihood of arbitrary and capricious application. The regulation further provides no discernable process to guide the relevant agency official's decision to enact the automatic stay, other than it must be invoked pursuant to undefined DHS review procedures, and the vague requirement that an official must certify that the stay has evidentiary and legal support. See 8 C.F.R. § 1003.6(c). But, in addition to the absence of any standard to guide DHS' internal review and decisionmaking, there are no processes to review an official's certification that the stay is warranted, or even to enforce the certification requirement in the first place. The inefficacy of the certification requirement is evidenced by the fact that nothing in the record indicates any agency official satisfied that requirement before invoking the automatic stay to continue to detain Petitioner.

Second, the likelihood of erroneous deprivation is also high because the automatic stay is generally invoked only after an IJ has already granted release to an individual based on a finding that the noncitizen has established by clear and convincing evidence that they are not a flight risk or a danger to the community. As such, the stay is effectively a unilateral automatic stay pending appeal *as of right* afforded to the losing party—the agency official who has just failed to present evidence or argument sufficient to convince a judge that detention is warranted. The Court finds this unchecked power vested in DHS to prolong an individual's detention cannot in any circumstance be a "carefully limited exception" to an individual's right to liberty as required by the Due Process Clause. See Salerno, 481 U.S. at 755.

Further, this unilateral stay stands in contrast to the ordinary requirements of overriding a judge's order pending appeal, which requires a showing of, *inter alia*, a likeliness of success on the merits of the appeal and irreparable injury in the absence of a stay. See Nken v. Holder, 556 U.S. 418, 426 (2009). The automatic stay thus presents a conflict of interest in conferring unreviewable discretionary authority in the same prosecuting agency official that makes erroneous deprivation not just a risk, but likely. See e.g., Günaydin, 2025 WL 1459154 at *8 ("the challenged regulation permits an agency official who is also a participant in the adversarial process to unilaterally override the immigration judge's decisions . . . [and] is anomalous in our

legal system . . .); Zavala v. Ridge, 310 F.Supp.2d 1071, 1078 (N.D. Cal. 2004) (holding the automatic stay creates a serious risk of error because it conflates the functions of adjudicator and prosecutor); Ashley v. Ridge, 288 F. Supp. 2d 662, 670–71 (D.N.J. 2003) ("the automatic stay provision . . . was enacted precisely to avoid the need for. . . individualized determination[s]. Aliens like Petitioner can consequently remain in detention no matter how frivolous the appeal by the Government."); see also Reynosa Jacinto v. Trump, 4:25-cv-03161-JFB-RCC at *7 (D. Neb. August 19, 2025); Maldonado v. Olson, No. 25-CV-3142 (SRN/SGE), 2025 WL 2374411, at *13 (D. Minn. Aug. 15, 2025) (same).

With regards to the probable value of additional procedure, it is not difficult to conclude that *any* additional procedure is valuable where, as here, the only procedure required for continued detention appears to be an agency official checking a box and filing a form.[8] Moreover, the regulation itself contemplates alternative avenues to stay an IJ's bond release order that require review by the BIA on an expedited basis. 8 C.F.R. § 1003.19(i)(1) allows DHS to request an emergency stay of the IJ's custody determination by appealing to the BIA, which then conducts a preliminary review based on the individual circumstances of the detainee and merits of the case. "This process cures the due process infirmities of § 1003.19(i)(2) while preserving the government's interest in preventing an erroneous release." Günaydin, 2025 WL 1459154, at *9; Reynosa Jacinto, 4:25-cv-03161-JFB-RCC at *7. Accordingly, the second Mathews factor also weighs heavily in favor of Petitioner.

### iii. The Government's Interest and Burden of Additional Process

The third and final Mathews factor considers the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. While Respondents make no argument

---

[8] As discussed above, while the regulation requires a certification made by a high-level DHS official that sufficient factual and legal bases exist to justify continued detention, see 8 C.F.R. § 1003.6(c), Respondents have presented no evidence that such a certification was made prior to the invocation of the stay. This provides *a separate and independent basis* for ordering Petitioner's release because Respondents have failed to establish the requirements for invoking the automatic stay were satisfied even on the regulation's own terms.

regarding the Mathews test, they assert that the Government's broad interest in steady enforcement of immigration laws and preserving the BIA's authority without judicial intervention warrants denying Petitioner relief. The Court acknowledges that the Government's interests in "protecting the public from dangerous criminal aliens" and "securing an alien's ultimate removal" are "interests of the highest order." Rodriguez Diaz, 53 F.4th at 1188-89. The Court finds, however, that these interests are in fact protected by the individualized determination by an IJ whether a noncitizen should be granted bond under § 1226. And "the government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions." Hernandez v. Sessions, 872 F.3d 976, 994 (9th Cir. 2017). So, in failing to articulate any reason why detaining noncitizens who have prevailed at a bond hearing is necessary to enforcing immigration law, the question arises "whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." Demore, 538 U.S. at 532–33 (Kennedy, J., concurring).

Moreover, Respondents arguments regarding the BIA's agency authority carries little weight where the BIA has no authority to adjudicate a detainee's constitutional rights—this Court is the proper forum to challenge the constitutionality of DHS' procedures. The same is true regarding the proper interpretation of the INA, which is "the proper and peculiar province of the courts" pursuant to the Framers' structuring of the Constitution "to allow judges to exercise that judgement independent of influence from the political branches." Loper Bright, 603 U.S. at 385 (citing The Federalist No. 37, p. 236 (Cooke ed. 1961) (J. Madison)). Accordingly, the Government's interest in preserving the BIA's authority without judicial intervention has no weight in this context.

Finally, with regards to the question of the burden on the Government imposed by additional or substitute process, the use of already existing procedures, including the procedures for custody redetermination and for requesting an emergency stay of an IJ's bond order from the BIA, cannot be said to be a fiscal or administrative burden on the Government, as these

procedures have existed and been utilized in the immigration context for decades. Further, courts cannot "allow constitutional violations to continue simply because a remedy would involve intrusion into an agency's administration." Baird, 81 F.4th at 104 (cleaned up) (citations and quotation marks omitted). What is more, the administrative costs of allowing noncitizens to be released on bond are far lower than keeping them in detention. See Hernandez, 872 F.3d at 996 (Noting in 2017 "the costs to the public of immigration detention are staggering: $158 each day per detainee, amounting to a total daily cost of $6.5 million. Supervised release programs cost much less by comparison: between 17 cents and 17 dollars each day per person).  Accordingly, the third factor also weighs against the Government.

In sum, the Court finds the automatic stay regulation to be facially unconstitutional because it lacks any reference to or establishment of any procedure for challenging its invocation. The Court finds that there can be no possible application of this regulation that would satisfy due process where it purports to authorize the most severe and recognized deprivation of liberty without a hint of a process to challenge such deprivation. In contrast, as the Supreme Court in Demore highlighted in upholding the mandatory detention of a noncitizen convicted of a crime under § 1226(c), "process" has been built into that mandatory detention scheme. For example, § 1226(c) applies to detainees whose convictions were generally "obtained following the full procedural protections [the] criminal justice system offers." Demore, 538 U.S. at 513; id. at 525 n.9 (noting that "respondent became 'deportable' under § 1226(c) only following criminal convictions that were secured following full procedural protections"). And if mandatory detention becomes unnecessarily prolonged in that context, the due process' prohibition of arbitrary government detention could entitle a detainee "to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." Id. at 532 (Kennedy, J., concurring). Detention pursuant to the automatic stay after the government already failed to establish a justification for it, with no process afforded to challenge the detention as arbitrary, is facially violative of procedural due process.

The Court further finds the automatic stay violates procedural due process as applied to Petitioner. Where, as here, a noncitizen is detained after having been ordered released, without

1    any process provided by the Government for challenging his continued detention, detention

2    becomes arbitrary and violates due process. See e.g., Rodriguez v. Marin, 909 F.3d 252, 256-57

3    (9th Cir. 2018) ("[L]iberty is the norm, and detention prior to trial or without trial is the carefully

4    limited exception.") (quoting Salerno, 481 U.S. at 755).

5                      3.  Substantive Due Process

6         Government detention violates substantive due process unless it is ordered in a criminal

7    proceeding with adequate procedural protections, or in non-punitive circumstances "where a

8    special justification . . . outweighs the individual's constitutionally protected interest in avoiding

9    physical restraint." Zadvydas, 533 U.S. at 690. Further, noncitizens like Petitioner have a

10   "weighty" liberty interest in in their right to "live and work in this land of freedom," which they

11   have each peacefully enjoyed for years or decades. Landon v. Plasencia, 459 U.S. 21, 34 (1982).

12        As applied,[9] the regulation at issue, which has permitted unilateral government detention

13   of Petitioner without a case-by-case determination, after a reasoned finding by an IJ that he does

14   not pose a threat to safety or a risk of flight, violates substantive due process because the

15   Government has asserted no special justification that outweighs Petitioner's constitutionally

16   protected liberty interest. Indeed, Respondents here have not articulated *any* interest—let alone a

17   compelling interest—to justify invoking the automatic stay provision, and even failed to follow

18   the due process protections contained within the automatic stay provision itself by satisfying the

19   certification requirement. Accordingly, in addition to finding that the challenged regulation

20   violates procedural due process, this Court finds that Respondents continued detention of

21   Petitioner violates his substantive due process rights.

22        Because the Court finds Petitioner's continued detention likely violates the INA and is

23   unconstitutional, the Court finds he has established a likelihood of success on the merits. The

24   Court now turns to the remaining Winter factors.

25        _____

26        [9] Because C.F.R. § 1003.6(c) requires an appropriate agency official to certify factual and legal circumstances exist to justify continued detention, the Court is not prepared to find there is *no* set of circumstances where the Government might have a special justification to stay an IJ's bond order sufficient to satisfy a detainee's substantive due process rights. The Court's finding that the regulation violates Petitioner's substantive due process rights is therefore limited to his as applied challenge.

1

2          ii.  *Irreparable Harm*

3          The next factor requires a showing "that irreparable harm is likely, not just possible" in

the absence of preliminary injunctive relief. <u>Alliance for the Wild Rockies</u>, 632 F.3d at 1131.

4   Petitioner clearly faces irreparable harm in the absence of a preliminary injunction. "It is well

5   established that the deprivation of constitutional rights 'unquestionably constitutes irreparable

6   injury.'" <u>Melendres v. Arpaio</u>, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting <u>Elrod v. Burns</u>, 427

7   U.S. 347, 373 (1976)). Thus, it follows "inexorably" from this Court's conclusion that

8   Respondents reading of § 1225(b) to apply to Petitioner and others similarly situated raises

9   serious constitutional concerns, and that the detention via the automatic stay is

10  unconstitutional—such that Petitioner would continue to be deprived of his physical liberty

11  unconstitutionally in the absence of an injunction—that Petitioner has carried his burden as to

12  irreparable harm. <u>Hernandez v. Sessions</u>, 872 F.3d 976, 995 (9th Cir. 2017). The Ninth Circuit

13  has further recognized in concrete terms the irreparable harms "imposed on anyone subject to

14  immigration detention (or other forms of imprisonment)." <u>Id.</u> In the absence of Petitioner's

15  requested injunction, "harms such as these will continue to occur needlessly on a daily basis." <u>Id.</u>

16         iii.  *Balance of Equities and Public Interest*

17         The remaining two factors for a preliminary injunction—the balance of equities and

18  public interest—"merge" when the government is the opposing party. <u>Baird v. Bonta</u>, 81 F.4th

19  1036, 1040 (9th Cir. 2023) (quoting <u>Nken</u>, 556 U.S. at 435). When "the impact of an injunction

20  reaches beyond the parties, carrying with it a potential for public consequences, the public

21  interest will be relevant to whether the district court grants the preliminary injunction."

22  <u>Hernandez</u>, 872 F.3d at 996 (quoting <u>Stormans, Inc. v. Selecky</u>, 586 F.3d 1109, 1139 (9th Cir.

23  2009)). The Ninth Circuit has recognized that "neither equity nor the public's interest are

24  furthered by allowing violations of federal law to continue." <u>Galvez v. Jaddou</u>, 52 F.4th 821, 832

25  (9th Cir. 2022) (holding that the district court did not abuse its discretion in finding the balance

26  of hardships weighed in favor of plaintiffs who credibly alleged that the government was

27  violating the INA).

28         The harm to the government here is minimal. As discussed above, the Government's

claim that its interest in the "steady" enforcement of its immigration laws would be harmed by the Court's ruling is specious, given DHS' new reading of the INA upends decades of consistent agency practice, and subjects millions of individuals to mandatory detention who have hitherto been afforded release on bond. The attendant administrative and fiscal costs of such a mass detention policy are difficult to fathom. Therefore, it is doubtful that this policy supports the Government's interest in steady enforcement of the INA.

Further, Respondents' claim that an injunction would burden the Government because judicial intervention would disrupt the *status quo* fails, because the *status quo* for purposes of a preliminary injunction refers "not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000). The *status quo* thus precedes DHS' July 8, 2025 change in policy—in other words, the *status quo* is that § 1226(a) applies to Petitioner and noncitizens similarly situated. As such, the burden on the Government here is minimal because the preliminary injunction simply preserves the *status quo*.

In contrast, the hardships faced by Petitioner and the public interest in granting injunctive relief weigh strongly in his favor. Detention has separated Petitioner from his family, business, and community and imposed increased financial, caregiving, and emotional burdens on his wife and children. Hernandez, 872 F.3d at 996 ("in addition to the potential hardships facing [the plaintiff] in the absence of the injunction, the court may consider the indirect hardship to their friends and family members) (quotation marks and citation omitted). And because the Court has found it is likely that Respondents are unlawfully detaining Petitioner under § 1225(b)(2), "neither equity or the public interest are furthered" by allowing Respondents' violation of the INA to continue—quite the opposite. Galvez, 52 F.4th at 832; Hernandez, 872 F.3d at 996 ("The public interest benefits from an injunction that ensures that individuals are not deprived of their liberty and held in immigration detention because of . . . a likely unconstitutional process.").

As such, this Court finds the balance of the equities and public interest "tip sharply towards" Petitioner. All. For the Wild Rockies, 632 F.3d at 1127. Therefore, even under a lesser showing that Petitioner has raised only "serious questions going to the merits" of his challenge to

1    his detention under the INA and Constitution, Petitioner is entitled to a preliminary injunction

2    ordering his release.

3        **D. Bond**

4        Under Federal Rule of Civil Procedure 65(c), a court "may issue a preliminary injunction

5    . . . only if the movant gives security in an amount that the court considers proper to pay the costs

6    and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.

7    R. Civ. P. 65(c). "Despite the seemingly mandatory language, 'Rule 65(c) invests the district

8    court with discretion as to the amount of security required, if any.'" Johnson v. Couturier, 572

9    F.3d 1067, 1086 (2009) (quoting Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003)). "In

10   particular, 'the district court may dispense with the filing of a bond when it concludes there is no

11   realistic likelihood of harm to the defendant from enjoining his or her conduct.'" Id. (citation

12   modified) (quoting Jorgensen, 320 F.3d at 919). Respondents have not argued that releasing

13   Petitioner on bond will be costly. Therefore, the Court declines to set bond.

14

15       **VI.    CONCLUSION**

16       Based on the foregoing, and on the record and proceedings herein, **IT IS HEREBY**

17   **ORDERED** that Petitioner's Motion for Preliminary Injunction (ECF No. 5) is **GRANTED**.

18       **IT IS FURTHER ORDERED** that Respondents are enjoined from denying Petitioner

19   release on bond on the basis that he is subject to mandatory detention pursuant to 8 U.S.C. §

20   1225(b)(2).

21       **DATED:** September 17, 2025.

22

23   _____

24   **RICHARD F. BOULWARE, II**
     **UNITED STATES DISTRICT JUDGE**

25

26

27

28